**COLORADO**
Department of
Labor and Employment

**Division of Labor Standards and Statistics**
**707 17th St, Denver, CO 80202 |303-318-8441**
www.ColoradoLaborLaw.gov | www.LeyesLaboralesDeColorado.gov

**Claim Number:** 1007-25
**Filed Against:**
Cigna-Evernorth Services, Inc.
**Claimant:** Matthew Price

**Claim Key Number:** CK50072

| |
|---|
| **EXHIBIT B** |

# NOTICE OF DETERMINATION OF COMPLIANCE

The Colorado Division of Labor Standards and Statistics ("Division") has reached a determination regarding this claim. After reviewing the available documentation and evidence, the Division finds no violation of Colorado wage and hour statutes and regulations based on the allegations investigated. Enclosed is the Division's Determination, which explains the basis for its finding that the employer does not owe wages to the claimant under Colorado wage and hour statutes and regulations.

If you disagree with this determination, you may appeal it. The Division must receive your appeal request within 35 days from the date the determination was sent. To get a copy of the appeal form and related instructions: go online (Appeal Form); file a mobile-friendly version of the form (Mobile Friendly Appeal Form); ask us to send you a copy (email cdle_ls_appeals@state.co.us or call 303-318-8442); or pick up a copy in-person (707 17th St, Denver, CO 80202). You may also be able to file an appeal through our online portal. You will need to enter a Claim Key in the online portal, which is shown above. Whichever method you choose, it is your responsibility to meet the deadline. This determination will become final if we do not receive a valid appeal request by the deadline. For more information on appeals, consult the appeals INFO available at the Labor Law Guidance & Education webpage.

The claimant has the right to terminate the Division's administrative procedure pursuant to C.R.S. § 8-4-111(3). Any termination request by the claimant must be in writing and must be received by the Division within 35 calendar days of the determination date. If the claimant chooses to terminate, the Division will revoke the Determination of Compliance and will notify the employer in writing. The Division's involvement in this claim would end at that time, and the claimant would retain any right to file a legal action in court.

NOTE: The date this determination was originally issued and sent to the parties is the date used for purposes of calculating the 35 day appeal filing deadline per C.R.S. § 8-4-111.5(1) and the 35 day termination deadline per C.R.S. § 8-4-111(3). Any copies of this determination sent to the parties after that date do not change the aforementioned deadlines.

**COLORADO Department of Labor and Employment**

**Division of Labor Standards and Statistics**
707 17th St, Denver, CO 80202 |303-318-8441
www.ColoradoLaborLaw.gov | www.LeyesLaboralesDeColorado.gov

# DETERMINATION OF COMPLIANCE

## I. Introduction

On March 3, 2025, the Colorado Division of Labor Standards and Statistics ("Division") received wage complaint #1007-25 from the claimant named therein, filed against Cigna-Evernorth Services, Inc. ("employer"). The employer's address is One Express Way, St. Louis, MO 63121-1824.

Pursuant to C.R.S. § 8-4-101, et seq. (the "Colorado Wage Act"), the Division is required to investigate all wage complaints received. The Division conducted an investigation of the complaint, and upon review and consideration of all available documentation and evidence, this Determination of Compliance is issued by the Division pursuant to Colorado wage and hour statutes and regulations.

The claimant alleged they were owed $7,500.00 in unpaid overtime. Based on the available evidence, the Division concludes that the employer does not owe wages to the claimant under Colorado wage and hour statutes and regulations. Accordingly, the complaint is hereby dismissed.

## II. Discussion

1. Facts and Reasoning

The claimant worked for the employer most recently as a Quality Review and Audit Analyst from December 1, 2014 to December 1, 2023, at the most recently agreed-upon rate of $20.42 per hour.[1] The claimant alleged that over 25 weeks (approximately June 1, 2023 to December 1, 2023), they worked 10 overtime hours per week and were owed $7,500.00 in unpaid wages.[2] The claimant provided sufficient evidence to infer that the employer failed to pay all earned wages.

The Division sent a Notice of Complaint ("NOC") to the employer on September 3, 2025, which included a copy of the written wage complaint, all supporting documents provided from the claimant, and a blank Employer Response Form ("ERF"). The employer was required to respond by September 24, 2025. On September 18, 2025, the Division received a request for an extension due to the absence of key staff who were working on the claim. The Division provided a one-time extension, and the response deadline was updated to October 8, 2025.

The Division received the employer's response on October 13, 2025. The employer denied they owed any wages to the claimant. The employer stated that the claimant had not actually completed work throughout the work day while he was clocked in. The employer submitted an explanation of their position, including text messages sent to the claimant; the claimant's pay statements; copies of

---

[1] Supported by pay statements, the employer corrected the hourly rate of pay in the claimant's allegations, which was originally alleged as $21.00 per hour.

[2] (10 overtime hours per week x $21.00 per hour x 1.5 overtime premium x 25 weeks) = $7,875.00. This amount was revised to the Division's statutory maximum of $7,500.00.

Colorado Wage Complaint #1007-25
filed against
Cigna-Evernorth Services, Inc.

disciplinary actions regarding the claimant's work performance; their overtime policy; their policy on pay; their policy on time reporting; a copy of the job aid for employees on how to enter and edit time worked in their timekeeping system; a copy of the claimant's termination letter; the claimant's time keeping records; and an Evaluation Audit on the claimant's work performance.

The Division applies a shifting burden of proof structure with respect to the claimant and the employer. After a claimant meets their initial burden of establishing a basis for the wage claim, by creating a reasonable inference of a violation of Colorado wage and hour laws, the burden then shifts to the employer to disprove any violation of Colorado wage and hour laws. 7 C.C.R. § 1103-7, Rule 4.2.

Pursuant to the Colorado Wage Act, wages are "[a]ll amounts for labor or service performed by employees, whether the amount is fixed or ascertained by the standard of time . . . or other method". (C.R.S. § 8-4-101(14)(a)(I)). The Colorado Overtime and Minimum Pay Standards Order ("COMPS Order") requires the payment of overtime wages ("time and one-half of the regular rate of pay") for overtime work (hours worked over 40 per workweek, 12 per workday, or 12 consecutively). (7 Code Colo. Regs. § 1103-1: Rule 4). The COMPS Order defines time worked as the "time during which an employee is performing labor or services for the benefit of an employer, including all time s/he is suffered or permitted to work, whether or not required to do so." *Id.* at Rule 1.9. Additionally, performing any duties "off the clock," and/or "clocking or checking in or out," "shall be considered time worked that must be compensated." *Id.* at Rule 1.9.1. The COMPS Order also requires employers to keep "a true and accurate record for each employee" containing certain information and to issue earnings statements to employees showing certain information, including their "total hours worked in the pay period" and their gross earnings for the pay period. *Id.* at Rule 7.

The claimant alleged that they had worked ten (10) overtime hours weekly between June 1, 2023 to December 1, 2023. The claimant alleged that they "regularly worked overtime beyond my scheduled shift to meet my daily performance goals." The claimant stated they had to complete a certain number of evaluations each day but due to "system delays, call lengths, and other workload factors", they were required to work overtime. The claimant admitted they regularly clocked out of the timekeeping system, but then continued to work because "the company discouraged and disallowed overtime" and that they were "reprimanded by my supervisor" if they worked overtime. At this point it is important to note that the claimant and employer both agree that the claimant worked remotely in Colorado and reported to supervisors in the eastern U.S. time zone.

The claimant further detailed their work process, stating, "[t]o avoid raising suspicion, I would preliminarily fill out several scorecards and submit them before my shift ended, ensuring they were timestamped within my scheduled hours." The claimant admitted that this effectively resulted in their scorecard submissions occurring within minutes of each other, "which is impossible to do" because

Colorado Wage Complaint #1007-25
filed against
Cigna-Evernorth Services, Inc.

more time is actually needed to complete individual scorecards, including listening to phone calls in their entirety and then filling out scorecards regarding the phone call. The claimant explained that after they hurriedly submitted incomplete scorecards before their shift was over, they would clock out of the timekeeping system and then go back and actually complete the work that needed to be done for each scorecard. The work included listening to the calls, reviewing chats/emails, referencing SOPs (standard operating procedures), finalizing scores, and adding notes. The claimant admitted that they did this work "well past the end of [their] shift" and they did this most days of the week. The claimant confirmed they did not explicitly tell their employer that they were, " 'working off the clock,' but management should have known from the tools they used."

The employer described multiple reasons for their position that the claimant was not owed additional wages. The employer denied that they prohibited overtime or that they would not pay overtime wages, pointing to various areas within their policy which supported the payment of overtime. For instance, one area of the policy stated, "If someone is working, they must be paid – no exceptions! Employees cannot volunteer to perform work – and they cannot waive pay for overtime hours." Another area of the policy stated, "Allowing unauthorized tasks to be completed and then accepting the benefits of the work without compensating an overtime-eligible employee is not permitted." Furthermore, their policy explains that employees should record overtime hours and report them in the timekeeping system, that they should check their pay statements to ensure overtime was paid, and that they should notify the employer if there is an error. In further support of their position to correctly record time that is worked, the employer provided a copy of their job-aid which existed to assist the claimant on editing their timecard. The Division notes that the claimant was paid for more than 72 hours of overtime during 2020, indicating the claimant was at least aware of how to report overtime wages. Although the claimant indicated there were punitive repercussions for working overtime, there was no evidence to support this allegation. The Division finds that the employer provided enough evidence to conclude that if the claimant worked overtime, they would have been able to record it in the timekeeping system and be paid for it.

The employer denied the claimant was owed wages because it is their belief that the claimant was not actually working for large periods of time while they were clocked into the timekeeping system. The employer stated that during the claimant's "last two years of employment, [the employer] warned [the claimant] about its concerns with his performance and gave him multiple opportunities to voice concerns or explanations for his shortfalls." The employer described, and provided evidence to support, several dates within the allegation timeframe in 2023, in which the claimant either clocked in late to their shift or did not respond for long periods and performed no work despite having clocked in. For example, throughout 2023, the claimant was counseled for clocking in late and for submitting substandard and inaccurate work. On May 2, 2023, the claimant received a written warning for their tardiness and significant gaps during the workday in which there was no apparent work product or

performance; on July 27, 2023 the claimant was verbally warned for performance issues - which the claimant blamed on the employer's work system but which were not documented by the claimant and could not be found by the employer. The warning describes multiple instances in which the claimant was clocked in but unreachable by management, "[claimant] will also be responsible for responding to leadership's communication in a timely manner as outreaches have gone unanswered for long periods of time".  Another example described by the employer occurred after the Thanksgiving holiday in November 2023. The claimant was meant to return to work on Wednesday, November 29, 2023. The claimant's supervisor noticed that 3.5 hours into their assigned shift, the claimant was apparently not working. After contacting the claimant at 1:35pm EST (11:35am MST) via text message to determine if they were okay, they initially did not receive a reply. When the employer was finally contacted by the claimant via phone call, the claimant first alleged they had indeed been working,[3] though they were not clocked in and the employer could find no evidence of work being performed, and then admitted that they thought they were supposed to return to work the next day on the 30th. The workday gaps in which the claimant could not be found to have logged in or did not respond to the employer's requests for confirmation of their work attendance directly contradicts the claimant's assertions of having had to perform overtime work because they could not finish the work expectations and requirements during their scheduled shift time. It appears that they simply were not performing any work at certain points of their work day and to the extent they may have had additional tasks to do after their shift (which the Division does not find, as explained below), it was as a result of their own disengagement during the rest of the shift.

The employer and claimant both agree that the claimant submitted most, if not all, of their work product, at the end of the claimant's shift, often in the last hour.  More specifically, the claimant stated that during the last 30 to 60 minutes of their shift, they would preliminarily fill out several scorecards and submit them before their shift ended to ensure the scorecards had timestamps within their scheduled hours and that by doing so, each scorecard was completed  "within minutes of each other (which is impossible to do, realistically, if you have listen to an entire call and fill out a scorecard)." These actions do not appear to have been part of the employer's protocol for the claimant's position and the claimant did not explain why they could not have completed some of these tasks throughout the shift rather than in the last hour, as requested by the employer. In their response, the employer provided an analysis of an audit which was performed on the claimant's work product history which showed that the claimant "completed most of his work within the last hour of his workday . . . reflected in the system which shows he submitted audits back-to-back without adequate time to review each call". Thus, although the claimant stated they needed overtime because "I am thorough, which improves accuracy but takes longer, and I often handled complex cases, or assistance that would

---

[3] Indeed, the timesheet evidence provided by the employer indicates the claimant did not clock in to work until 11:40am MST, five minutes after the employer's 11:35am MST text message asking them if they were working.

Colorado Wage Complaint #1007-25
filed against
Cigna-Evernorth Services, Inc.

come up", disciplinary action documentation provided by the employer reflected that the claimant often submitted low quality work that was riddled with errors. In their response to the Division, the employer explained that the claimant submitted 8-9 of the required 22 daily scorecards and those submitted were not up to standard. The Division finds that the evidence and explanations provided by the employer contradicts the claimant's explanation that the secondary reason for the alleged overtime hours was to perfect the accuracy and metrics of their work product.

By providing copies of the disciplinary actions regarding the claimant's work performance, a copy of the claimant's termination letter, and an Evaluation Audit on the claimant's work performance, the employer established that the claimant had clocked into work, but consistently did not perform work for significant blocks of time, and when they did submit work, the claimant submitted a low volume of work which was inaccurate or incorrectly completed. Furthermore, the totality of the evidence and explanations submitted to the Division indicates that the claimant is not owed additional wages because pursuant to the definition of time worked, as found in COMPS Rule 1.9, they were neither suffered (allowed) nor permitted to work overtime. In this context, permitted would mean the employer either knew or had reason to know that the claimant was performing labor or services for the benefit of the employer. The claimant alleges detailed steps they took to conceal overtime but also alleges that the employer would have known of their overtime work. Yet, the evidence provided demonstrates that the employer could not and did not know of any alleged overtime work because the work product they received was not up to standard - which perfection and correction of the work was the alleged labor or service the claimant was performing during overtime. Nevertheless, if the claimant had worked overtime hours they would be owed overtime wages, as wages must be paid for labor or services regardless of the quality of that work or the lack of prior permission or notice. (Note: COMPS Rule 1.9 includes "time worked" "whether or not required to do so" by the employer).  However, here, the Division finds no evidence of overtime hours worked. Moreover, if there was some evidence of overtime hours performed at some point between  June 1, 2023 to December 1, 2023, the Division finds the claimant would still not be owed wages. This is because the employer has proven by a preponderance of the evidence that the claimant was paid wages for time in which they were clocked in but not performing any work. The claimant was effectively prepaid any owed wages. Accordingly, the Division dismisses this claim.

### III. Trade Secrets

The Division may release this decision or other records in this investigation to the public if it receives an open records request under the Colorado Open Records Act ("CORA"), Part 2 of Article 72 of C.R.S. Title 24, and C.R.S. § 8-1-115(1)(b), with redactions of personal claimant information and other information protected against disclosure. The Division is now notifying you before any such possible release, and providing you an opportunity to demonstrate that any such information is a trade secret,

or protected as other "privileged information, [or] confidential commercial, financial, geological, or geophysical data." C.R.S. § 24-72-204(3).[4] If you wish to so demonstrate, you have 20 calendar days from the date of this decision to do so by providing a detailed written explanation, along with any further supporting documentation. If the Division does not receive a timely response, it will treat this final decision and/or related investigation records as public records that may be released in response to open records requests. If you choose to respond, the Division will review your response and alert you of a final decision.

### IV. Conclusion

For the foregoing reasons, the Division determines that the employer does not owe wages to the claimant under Colorado wage and hour statutes and regulations. Accordingly, the complaint is hereby dismissed.

Unless this Determination of Compliance is appealed by any party or terminated by the claimant within 35 calendar days of the date of this Notice, this is the final decision of the Colorado Department of Labor and Employment.

Dated this 10th day of December, 2025,

Division of Labor Standards and Statistics
Colorado Department of Labor and Employment

Select method(s): Emailed to the parties named herein on December 10, 2025.

---

[4] C.R.S. § 7-74-102(4) defines a trade secret as:

the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, address, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a trade secret; the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

The Division applies the following factors to determine if the information is a trade secret:

(1) the extent to which the information is known outside the business; (2) the extent to which the information is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the saving effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1251-52 (D. Colo. 2001). If you have questions about what constitutes a trade secret or other information protected against disclosure, you may contact a private attorney

Colorado Wage Complaint #1007-25
filed against
Cigna-Evernorth Services, Inc.

COLORADO
Department of
Labor and Employment

**Division of Labor Standards and Statistics**
707 17th St, Denver, CO 80202|303-318-8441
www.ColoradoLaborLaw.gov | www.LeyesLaboralesDeColorado.gov

# Post-Determination FAQ
Last updated 10/28/2025

**Q1: The division has issued a determination for my wage claim. What will happen next?**

A1: The determination packet you received contains 3 distinct parts: a cover sheet; the determination packet, which explains the legal and factual findings in support of the division's conclusion; and a Notice of Assessment and Requirement to Report Payments Made ("NOA") that outlines timelines for payment and consequences of nonpayment. **Please read thoroughly the determination in full** as it contains all the information needed for the parties to understand the Division's reasoning behind its decision and its expectations upon an employer to pay or comply with its findings and order.  If, upon your review of the determination, you have further questions, please email them to cdle_pdcomm@state.co.us.

**Q2: I am an employer that wishes to pay the wages ordered.  What should I do?**

A2: The determination packet you received includes a Notice of Assessment and Requirement to Report Payments Made ("NOA"), which outlines the timeline to pay, for which amounts, by when, and how to report payments made to the employee.  **Please read the NOA thoroughly, send payment to the employee using the address indicated in the NOA, and provide proof of payment via email to** cdle_labor_standards@state.co.us.  Your proof of payment must contain a copy of the check sent to the employee; a pay statement detailing the payment and deductions made to the wages issued; and proof of sending (postmarking or tracking information).  If, after reviewing the Citation and NOA in full, you have further questions, please email cdle_pdcomm@state.co.us.

**Q3: Now that a determination has been issued with a finding that the employer owes me wages and penalties, how would I receive payment of these amounts?**

A3: Included in the Determination packet you received is a Notice of Assessment and Requirement to Report Payments ("NOA") that outlines the amounts due, and when they must be paid by the employer.  The employer is directed in the NOA to send payment directly to you by mailing a check to the address provided to the Division.  If you have changed your address and have not updated your information prior to our issuance of the Determination, please email cdle_pdcomm@state.co.us immediately.  If the employer issues payment and does so using the address you have provided the Division, you will have to coordinate payment with the employer directly and request that they send payment to your updated and most current address.

Colorado Wage Complaint #1007-25
filed against
Cigna-Evernorth Services, Inc.

**Q4: Can I request the employer to send payment via direct deposit, or through other means than by sending a check payment to my address?**

A4:  The Division may accommodate special requests concerning payment if it is communicated to their Compliance Investigator ("CI") *before* a determination is issued.  In some cases, the instruction may be included in the determination as a reminder for the employer to follow when sending payment to the claimant.  However, if the claimant wishes to avail of a means of payment not communicated prior to the issuance of a determination, or such payment option is elected by the claimant after the determination is issued, then the responsibility is on the claimant to contact the employer to coordinate payment through their elected means of receipt of that payment.

**Q5: I am homeless and have no address that can be used to receive the employer's payment.  How do I receive my payment?**

A5: If you are unable to provide an address with which payment may be received, the Division advises that you provide an address for a family member or an authorized representative. Please let your Compliance Investigator know if neither option is available.

**Q6: My former employer has reached out and requested to pay in installments, is this allowed?**

A6: The parties may agree to a payment arrangement provided it complies with the timelines indicated in the NOA included with the determination.  The employer must pay all wages determined to have been owed in the Citation and NOA within 14 days from the date of the Citation to avail of the offer of reduction for penalties and fines.  Penalties owed to the claimant may be paid incrementally by the employer, provided such payment is made in full within 60 days from the date of the Citation.  Fines owed to the Division may be subject to a payment plan that the employer may set up with the Division.

**Q7: I received payment from the employer, what should I do?**

A7: If you received payment from your employer, please send a copy of the payment to the Division's general email address at cdle_labor_standards@state.co.us.  You may send a copy of the check, the pay statement (if one was supplied with the payment you received), and a copy of the envelope reflecting the postmark date of when the payment was sent.

**Q8: I received payment, but it appears to be for an incorrect amount.  What should I do?**

A8: If the employee receives payment, they should report the payment by emailing cdle_labor_standards@state.co.us.  They should provide details about when they received payment and the amount received and provide copies of the check and envelope containing the check payment (or proof of the direct deposit).  If they believe the amounts paid are incorrect, they must detail why they think it is incorrect. The Division will ascertain if further amounts are owed, and if all

amounts are not paid after 60 days from the date of the Citation (and an appeal is not pending), the Division may issue a certified copy for the amounts determined to be owed.

**Q9: I received the determination, and I disagree with the Division's findings.  I would like to file an appeal. What should I do?**

A9: If you disagree with the determination, you may appeal it. The Division must receive your appeal request within 35 days from the date the determination was sent. To get a copy of the appeal form and related instructions, you must go online to cdle.colorado.gov/decisions-appeals-information. A mobile-friendly version of the form is found at: Mobile Friendly Appeals and Decisions Information. Alternatively, you may ask us to send you a printed copy by contacting us directly by email at cdle_ls_appeals@state.co.us  or call 303-318-8442.  You may also pick up a copy in person at 707 17th St, Denver, CO 80202. You may also be able to file an appeal through our online portal. You will need to enter a Claim Key, which is shown at the top left of the cover page included with the determination. Whichever method you choose, it is your responsibility to meet the deadline. For more information on appeals, please consult the appeals INFO available at our Labor Law Guidance & Education webpage (cdle.colorado.gov/infos).

**Q10: What happens after an appeal is filed?**

A10: After an appeal request is received and reviewed, the Division will notify the parties of the appeal.  If the appeal is valid, a hearing will be scheduled. After the hearing, the Hearing Officer will issue a decision either affirming the CI's determination in full, modifying the determination in part, or reversing the CI's findings. If the Hearing Officer believes that an appeal is valid but that a hearing is not necessary (from the error alleged in the appeal request), they will ask the parties if they agree that the Hearing Officer can write a decision based on the written record and filings. If an appeal is invalid– for example, if it is frivolous or untimely—the appeal will be denied. For more information on appeals, please consult the appeals INFO available at https://cdle.colorado.gov/infos.

**Q11: What happens to the penalty and fine reduction offer and 60-day penalty and fine increase during an appeal?**

A11: If the employer appeals a CI's determination that it owes wages, penalties, and fines, it rejects any penalty and fine reduction offer granted to the employer in the original determination, and it is not entitled to the reduction offer if the Hearing Officer affirms a finding that the employer owes wages to the claimant. It may nevertheless be beneficial for the employer to pay any portion of the wages ordered in the Citation and NOA that the employer agrees are owed to the claimant.

If the claimant appeals a CI's citation finding that the employer owes money to the claimant, the employer must still pay the claimant within the deadlines set by statute and the determination in order to accept any penalty or fine reduction offer in the citation.

Filing an appeal does not automatically pause any deadlines set out in, or triggered by, the determination, unless the determination states otherwise. Generally, the Division's citations will note in a footnote whether the filing of a valid appeal pauses/resets the 60-day penalty and fine increase deadline until 60 days after the appeal decision is issued.

For more information on appeals, please consult the appeals INFO available at https://cdle.colorado.gov/infos.

**Q12: What happens to an appeal filed by a claimant if they accept payment of all the wages and penalties ordered in the determination?**
A 12: If the claimant accepts payment of the full amount of wages and penalties ordered in the determination (Citation and Notice of Assessment), the claimant is not permitted to appeal. If the determination did not order the employer to pay any amounts or the determination ordered the employer to pay some amount but the claimant does not accept payment after the determination for the full wages and penalties ordered, the claimant may file an appeal request.

**Q13: It is past the deadlines outlined in the NOA for the employer to pay, and an appeal was not filed. I have not received any payment, what do I do next?**
A13: If the employer fails to pay any wages or penalties ordered in the Citation and Notice of Assessment after 60 days from the date of the determination, the Division may file a Certified Copy of an NOA, or order imposing wages due, fines, penalties with the clerk of any court having jurisdiction over the parties. The clerk of the court shall record the NOA in the judgment book of the court and make an entry in the judgment docket. Upon recording, the NOA will have the effect of and may be executed as a judgment of the court.

**Q14: I received a Notice of Filing of Judgment Pursuant to §8-4-113(2) from the court, what do I do next?**
A14: Once a certified copy is filed with the courts as a judgment, the Division's involvement with the wage claim has officially ended because the investigation process is concluded. The Division *does not* assist with the collection of filed judgments.  The claimant may pursue several collection methods through the court which may include garnishing employer assets, placing a lien against the employer or even directly requesting the employer to pay what was ordered. The Court's Self Help Webpage: Collecting a Judgment has specific information for parties seeking to collect money that they are owed via an active judgment.

**Q15: I have not been paid by my employer and 60 days have passed since the determination was issued (and an appeal is not pending). Aside from the filing of a certified copy, is there another action against the employer I can pursue?**

A15: The Division **may** issue a notice of administrative lien and levy if an employer or other Division debtor fails to pay wages or penalties determined to be due upon an employee's written request.  To start the request process, an email may be sent with the subject line "Liens and Levies Request" to the Division's Post-Citation Enforcement team's email at cdle_pce@state.co.us. Upon receipt of the employee's email, the Division will provide you with a request form to complete and submit. After receiving this completed request form, and subject to the Division's discretion to issue such notices on its own initiative at any later time, the Division will inform the employee within 60 calendar days whether it will issue a notice of administrative lien and levy against the employer, debtor or known co-owner, or persons in control or custody of assets for the employer.  For information please refer to INFO 2D available at cdle.colorado.gov/infos.

**Q16: The employer has reached out to me to offer a settlement after the determination has been issued.  What should I do?**

A16: Parties to a wage claim investigation may enter into an agreement to settle the claim at any stage of the investigation, including after a determination has been issued but before the determination becomes final.  A determination becomes final if no termination request or appeal is filed after 35 days from the date of the determination.  If the parties agree upon a settlement, the claimant may elect to terminate (end) the claim by requesting a termination in writing within 35 days from the date of the determination. A request to terminate may be sent to the division's inbox at cdle_labor_standards@state.co.us.  Please reference your wage claim number in the subject line and indicate that you are requesting a termination of the claim. Terminating the claim means that it is as if the investigation never took place and a determination was not made.

If the parties agree to settle after a party has filed an appeal and the 35-day appeal/termination deadline has passed, but before the hearing, the appealing party must provide the signed settlement agreement to the Division and proof of payment for any agreed-upon amount(s). The Appeals Unit will dismiss the appeal. The CI's original determination will remain on the books, but the Division will not issue a certified copy or pursue collections for the amounts ordered if the claimant receives the agreed-upon settlement payment.

**Q17: My employer or a named individually liable party ("IL Party") to the claim has filed for bankruptcy.  What happens next?**

A17: Under the U.S. Bankruptcy Code, when an employer or IL party files for bankruptcy (then known as the "debtor"), the bankruptcy filing will automatically stay (pause) a person or entity — including the Division — from starting or continuing an action or proceeding to enforce a money judgment

against the debtor.  Even if the Division has already issued a determination or citation finding that the debtor owes money to a claimant, the automatic stay prevents both the claimant and Division from starting or continuing an action or proceeding to collect the owed money **outside** of participating in the pending bankruptcy proceeding itself. So, a possible recourse for the employee is to recover through the bankruptcy proceeding as a creditor of the employer or IL party. The claimant is advised to contact the trustee for the bankruptcy proceeding or the bankruptcy court handling the bankruptcy case so they may be added as a creditor. Please note that the automatic stay applies **only** to actions brought against the party who filed for bankruptcy. For example, if the Division issued a citation or judgment that an employer entity and IL party jointly and individually owe money to a claimant — but only the employer entity has filed for bankruptcy — the automatic stay does not prevent a claimant from starting or continuing an action to collect money owed from the IL party (and this example works vice versa). That the IL party is identified as the owner of the employer entity does not matter for this purpose.

### Q18: What does "joint and several liability" mean?

A18: To be jointly liable means that an employer and ILP are both responsible for all wages and penalties owed to the claimant. To be severally liable means that the employer and the ILP are individually responsible for all wages and penalties owed to the claimant. This does **not** mean that the claimant can collect the full wages and penalties owed from **both** the employer and the ILP. The claimant can collect the full wages and penalties owed **once** but may collect them from any or all parties.

### Q19: My employer has been intimidating and harassing me. What do I do?

A19: If your employer shows you any behavior that may be construed as harassing or threatening, **please contact your local law enforcement authority immediately**.  Employers engaging in harassing behavior are warned that, pursuant to the Colorado Wage Act, C.R.S. § 8-4-120, employers "shall not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate or retaliate against any employee who has: (a) Filed any complaint or instituted or caused to be instituted any proceeding under this article 4 or any other law or rule related to wages or hours; or (b) Testified or provided other evidence, or may testify or provide other evidence, in any proceeding on behalf of the employee or other Person afforded protections under this article 4 or under any other law or rule related to wages or hours."  Further, C.R.S. § 8-4-120(2) and (3) provide that, **an employer who is found to have violated this above noted section *commits a class 2 misdemeanor*.**  An employee who alleges a retaliation violation against an employer may file a civil action in court against the employer to seek legal and equitable relief to remedy the violation, including: back pay; reinstatement or front pay; payment of unlawfully withheld wages; interest on unpaid wages; penalties of $50.00 per day; liquidated damages; injunctive relief; and attorneys fees.  The Division may investigate and enforce discrimination or retaliation prohibited by the Wage Act, and after investigation, may order the relief specified under C.R.S. § 8-4-120(3)(a).